UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

### Case Number:  08-21569-CIV-MORENO

HOLSTON  INVESTMENTS  INC.  B.V.I.  and
ALBERT P. HERNANDEZ,

       Plaintiffs,

vs.

LANLOGISTICS, CORP.,

       Defendant.

_____/

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This case exemplifies that value and price are not always one in the same.  After finding as

a matter of law that the Defendant violated a contractual right of first refusal, the Court held a bench

trial to determine the amount of damages due Plaintiffs.  Plaintiffs, Holston Investments, Inc., B.V.I.

and Albert P. Hernandez held a right of first refusal to purchase LanBox, Inc., a logistics company,

from Defendant LanLogistics, Corp..  In May 2007, LanLogistics failed to comply with the first

refusal right when it sold LanBox as part of a package deal to a third party, Paul Gartlan, without

first offering the Plaintiffs an opportunity to exercise their contractual right.

The Court found that the purchase price at which Mr. Gartlan bought LanBox was $450,000

of the $3.5 million he paid for the package of LanBox, SkyNet, and the All Carriers Line of

Business.  The measure of the Plaintiffs' damages is the investment value of LanBox minus the

$450,000 purchase price.  Both sides agree that the $450,000 purchase price does not reflect the

investment value of LanBox in May 2007.  At the non-jury trial on damages, the Court heard expert

testimony from both sides on the investment value of LanBox at the time of the sale. Pursuant to Federal Rule of Civil Procedure 52(a), the Court makes findings of fact and separate conclusions of law. The Court finds the testimony of Plaintiffs' expert, Mr. Richard Pollack, both credible and conservative in its estimate of LanBox. While the Court allowed, over Plaintiffs' objections, Defendant's expert, Hector Calzada, Jr., to testify, the Court was substantially more persuaded by the analysis that Mr. Pollack employed. Accordingly, the Court adopts Mr. Pollack's analysis and finds the value of LanBox to have been $5,500,000 at the time of the May 2007 sale. The measure of Plaintiffs' damages is therefore $5,050,000 plus prejudgment and postjudgment interest.

## I. Findings of Fact

LanBox (also known as SkyBox) is a "facilitator" of purchases for customers who live in Latin America. Mr. Alberto Hernandez was a founding member of LanBox and both he and Holston Investments, Inc. owned varying amounts of LanBox stock until they sold it to Defendant LanLogistics. In exchange for Mr. Hernandez and Holston's remaining shares of LanBox, the parties negotiated a right of first refusal in 2004. On May 16, 2007, Defendant LanLogistics sold LanBox as part of a package deal with two other companies, SkyNet and the All Carriers line of business to Mr. Paul Gartlan for $3.5 million. At the time of the sale to Mr. Gartlan, LanBox was not a stand-alone business. It was a subsidiary of the LAN network of companies.

The Court has already found that the sale to Mr. Gartlan was a breach of the right of first refusal; indeed, Defendant conceded that it violated the right in opening statement. (Tr. Vol. I at 34.) The Court also issued a Supplemental Summary Judgment Order finding that the purchase price of LanBox in the three-company transaction was $450,000. During the bench trial, the Court also found that Plaintiffs had the financial wherewithal to purchase LanBox, had they been given an

opportunity. (Tr. Vol. I at 167.)

Remaining for the Court is the issue of damages. After hearing testimony relating to the Plaintiffs' damages, the Court must now decide what amount Plaintiffs are due. Plaintiffs argue they are entitled to $5,050,000 and an estimated $1.3 million in prejudgment interest plus postjudgment interest. Defendant claims Plaintiffs are entitled to no more than $895,500 in damages and no prejudgment interest.

Plaintiffs' damages calculation is based on their position as "specially situated buyers" in the market for LanBox. Thus, Plaintiffs argue the investment value of LanBox to them is necessarily higher than the value of LanBox to Mr. Gartlan, who had never previously owned a logistics company like LanBox. Mr. Javier Luck, Defendant's representative at trial, did testify that LanBox would be more valuable to a company in the logistics business. (Tr. Vol. III at 114 "Q: Okay. So this company might be worth more to someone who is in that core business, correct? A. This company -- yeah. You might say that. Yes.".) The investment value is "the value to a particular investor based on individual investment requirements and expectations." (Pls.' Tr. Ex. 71 at 1.) Plaintiffs are requesting the Court calculate damages by deducting the $450,000 purchase price from the investment value of LanBox to Plaintiffs.

Defendant claims the wide gap between the two sides' damages calculation stems from differences among the experts in three areas: (1) the valuation approach and methodology best suited to calculate the value of LanBox; (2) the company specific rate that captures the risk associated with LanBox's business; and (3) the normalizing adjustments required to arrive at a level of sustainable cash flow.

To rebut Plaintiffs' damages claims, Defendant also points to Plaintiffs' mismanagement of

SkyPostal and Punto Mio, companies operated by Plaintiffs. As evidence of this claim, Defendant argues that SkyPostal's business operations have never generated cash or income as reflected by the cumulative retained earnings deficit of $9.257 million at year end 2006. There was a "going concern" letter issued for SkyPostal by independent auditors in 2006.

Defendant also points to the other bids received by industry participants for LanBox. Three of the bidders during the first round were industry participants. International Bonded Couriers, Universal Express, Inc., and Navitas Capital Advisors were involved in the delivery business. Although each had synergies with LanBox, none bid more than $800,000. During the second round of bidding, Raimundo Martinez submitted a bid to acquire LanBox for $1.5 million. Mr. Martinez owned a competitor of LanBox and had an existing delivery operation.

Plaintiffs caution the Court against using the other bids as evidence of value. (Tr. Closing Arguments at 6-7; Tr. Vol. III at 104-105.) Plaintiffs argue that Mr. Gartlan and LanLogistics had their own motivations to set the price of LanBox as low as possible and to set the price of All Carrier as high as possible in an effort to allocate that price solely to intangible assets, and depreciate those intangible assets. (Tr. Closing Arguments at 5.) Put another way, Plaintiffs argue LanLogistics had a tax motivation to maximize the price of All Carrier, which allowed it to write off hard assets on its tax returns that were not sold to Mr. Gartlan. *Id.*; *See* Order Granting Plaintiffs' Motion for Clarification. The parties, however, did not present evidence as to what motivated Defendant to sell the companies in this structure with the exception of the Defendant's tax returns that are in the record. (Tr. Vol. III at 110.) Plaintiffs also argue the Court should consider the evidence relating to SkyNet, which had been losing money and would continue to lose money for some time after the 2007 sale with LanBox. (Tr. Vol. III at 72.) The evidence showed that SkyNet had significant

liabilities in Brazil for taxes between $690,000 and $1.1 million (Pls.' Tr. Ex. 28; Tr. Vol. II at 82.) Mr. Gartlan also had to assume over half a million dollars in fines and credit for services for SkyNet. *Id.* Due to these issues with All Carriers and SkyNet, Plaintiffs argue the value of LanBox was artificially reduced at the time of the sale and it was not an arms-length deal. Plaintiffs argue the form of the transaction between LanLogistics and Mr. Gartlan is proof that the bids are not evidence of the company's value.

A. *Summary of the Plaintiffs' Synergies with LanBox*

Plaintiffs' fact witness, Mr. A.J. Hernandez, testified that Plaintiffs established the predecessor of LanBox (predecessor known as SkyBox), ran SkyBox prior to its acquisition by Defendant, and continued to run LanBox after Defendant acquired it. (Tr. Vol. I at 73.) Plaintiffs also operated a complimentary business, SkyPostal, which functioned to a certain extent like SkyNet, one of the companies that was sold to Mr. Gartlan in the package deal. (Tr. Vol. I at 70.) When Plaintiffs were unable to purchase LanBox, they developed a company called Punto Mio -- a start-up company. (Tr. Vol I at 71.)

Mr. A.J. Hernandez's testimony identified a number of synergies that SkyPostal would have had with LanBox, which increases the value of LanBox to Plaintiffs. He testified the Plaintiffs were familiar with the amount of space required to run a company like LanBox, the number of personnel required to run a company like LanBox, and the logistics involved in delivering both packages and letters. (Tr. Vol. I at 74, 88, 90-92, 94-96.) At the time of sale to Mr. Gartlan, SkyPostal was delivering over 1 million kilograms of mail in 2006. (Pls.' Tr. Ex. 57.) In 2006, Mr. Hernandez testified that SkyPostal was delivering 10% of its volume as parcels. (Tr. Vol. I at 71.) Plaintiffs argue that 10% translates into an average of 8,746 kilograms per month in 2006 as compared to

LanBox's average of 9,903 kilograms in packages per month in 2006. (Tr. Vol. II at 15-16); (Pls.' Tr. Ex. 58.) This comparison shows that both companies, SkyPostal and LanBox, were delivering approximately the same volume of packages per month, which shows that Plaintiffs had the know-how to handle the volume of the LanBox business.

Mr. Hernandez also testified that mail could be consolidated for transportation from the warehouse facility in Miami to the airport, handling fees such as the flat fees charged on master airway bills could be spread out over a larger volume, and clearance fees could similarly be spread out over a higher volume, resulting in lower per kilogram expenses and thus higher yield per kilogram. (Tr. Vol. I at 95-96.)

There was one final factor – the line haul rate – that featured prominently in Mr. A.J. Hernandez's testimony as providing a synergy his company, SkyPostal, would have had with LanBox. (Tr. Vol. I at 156-159); (Pls.' Tr. Ex. 57 & 58.) A line haul rate is the cost of transporting a package from the United States to Latin America. (Tr. Vol. II at 115.)    Line haul rates are important operating indicators that are used in the industry. LanBox's financial statements show that the average line haul cost per kilogram for 2006 varied from $2.64 to $3.31. (Pls.' Tr. Ex. 58.) SkyPostal's financial statements show that its average line haul cost for 2006 was $1.16. (Pls.' Tr. Ex. 57.) Plaintiff's argument is that since SkyPostal and LanBox serviced similar countries in Latin America, combining SkyPostal with LanBox would result in higher volume and lower line haul costs. (Tr. Vol. I at 162; Tr. Vol. II at 15 [Mr. Hernandez testimony:] "Our linehaul rates regardless of the fact whether they were dimensional or not, a kilo is a kilo; and you pay by the kilo that is sent. If they decide to charge you more because an item has volumetric weight, you'll pay additional per kilo; but it is the same effective rate per kilo regardless of the size of the package.  That said, we

shipped over 100,000 kilos a month; and they shipped on average 15,000 kilos a month. That is the reason we had much better linehaul rates than they did.".)

B. *Valuation Approaches*

Both experts agree there are three generally accepted valuation approaches -- income, market, and cost. (Pls.' Tr. Ex. 70 at § 2.0; Pls.' Tr. Ex. 71 at § 2.3.) The cost approach does not apply. Mr. Pollack used a combination of income and market approaches or an investment approach to determine LanBox's investment value in 2007. (Tr. Vol. II at 103.) Although both experts used an income approach, their methodologies differed. Mr. Pollack used a capitalization of income method, while Mr. Calzada used a discounted cash flow. The methods differ in that capitalization requires a perpetual and steady cash flow, while the discounted cash flow method accounts for changes in earnings. Both experts agree on the risk-free rate, the market premium, the small company market premium, and the industry risk premium. (Pls.' Tr. Ex. 71 at 22-23.) Defendant argues that it is unreasonable, given SkyPostal's history of uneven cash flows, to use a capitalization approach when there is no perpetual and steady cash flow.

The main disagreement between the experts is on the discount and company specific risk rates. Mr. Pollack used a 19.62% discount rate, while Mr. Calzada used a 26.6% rate. While both experts agree on the 3% growth rate, they disagree on the company specific risk rate, which takes into account the "stability of earnings and US and World economies in assessing the specific risk premiums due to the Company's particular operation." Mr. Pollack used a 3% company specific risk rate and Mr. Calzada used a 7% sovereign risk adjustment.

C.    *Summary of Richard A. Pollack's Testimony*

Plaintiffs' expert witness, Richard Pollack, presented testimony at trial regarding his

valuation of LanBox. The general thrust of Plaintiffs' case is that Mr. Pollack's expert opinion is conservative in its valuation of the investment value of LanBox. Mr. Pollack's final investment value for LanBox was approximately $5,500,000. (Pls.' Tr. Ex. 70; Pls.' Tr. Memo. Ex. A.)

There is no question Mr. Pollack is well-qualified as evidenced by his curriculum vitae and testimony. Indeed, Defendant did not challenge Mr. Pollack's ability to provide the Court with his expert opinion. Mr. Pollack is the Director of Forensic and Business Valuation Services at his firm, Berkowitz, Dick, Pollack and Brant, which was established in 1980. He is a Certified Public Accountant, Accredited in Business Valuation and Certified in Financial Forensics, an Accredited Senior Appraiser, a Certified Business Appraiser and a Certified Fraud Examiner. (Pls.' Tr. Ex. 70); (Tr. Vol. II at 19-25.)

### 1. *Growth, Discount, and Capitalization Rates Applied to Determine Value*

To calculate the investment value of LanBox to Plaintiffs, Mr. Pollack assumed a 3% growth rate and a 3% company specific risk rate. These rates are well-supported by Mr. Pollack's analysis of the data available for the relevant time period. (Pls.' Tr. Ex. 70 at 7-9.) The discount rate reflects the return required by investors considering the inherent risks of a particular entity. The discount rate incorporates the risk and reward of converting future cash flows into present value. The estimated discount rate Mr. Pollack derived was 19.62%, which incorporates the 3% company-specific risk premium. (Pls.' Tr. Ex. 70 at 8.) By deducting the long-term growth rate of 3% from the 19.62% discount rate, Mr. Pollack determined that a capitalization rate of 16.6% was appropriate. *Id.* at 9. Mr. Pollack used the 16.6% capitalization rate to determine the value of LanBox on May 16, 2007. He writes in his report: "[T]he equity value of LanBox, as of May 16, 2007, is equal to the present value of normalized future cash flows, equal to the pro forma net cash flow of $838,888,

multiplied by one plus the long-term growth rate of 3%, divided by the capitalization rate of 16.6%. This produces an equity value of $5,205,150, or $5,205,000, rounded, on a control basis under the income approach." *Id.* To verify this valuation, Mr. Pollack also employed a separate valuation model based on a market approach to valuation.

2.   *EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) Applied to Determine Value*

In Mr. Pollack's market approach to valuation, he arrived at 5 as the multiple for Earnings Before Interest, Taxes, Depreciation, & Amortization ("EBITDA"). (Pls.' Tr. Ex. 70 at 10.) Mr. Calzada agrees with the EBITDA multiple of 5 for LanBox. (Pls.' Tr. Ex. 71 at 29-30.) By employing this prior transactions method, Mr. Pollack determined that together with EBITDA, he would use a valuation multiple for market value of invested capital (MVIC) to revenues. Based on a comparison of factors, Mr. Pollack determined that 0.75 was the appropriate revenue multiple. Utilizing the 5 EBITDA multiple and the 0.75 MVIC, Mr. Pollack determined a value of $6,394,648 for the invested capital of LanBox.

3.   *Opinion as to Value*

In arriving at his opinion that LanBox was worth $5,500,000 at the time of the May 16, 2007, Mr. Pollack used the two approaches. One yielding a value of $5,205,000 and the other a value of $6,395,000. (Pls.' Tr. Ex. 70 at 11.) Mr. Pollack weighted each of those values at 50% and determined the value of LanBox was $5,800,000 and then he subtracted lease costs in the amount of $244,500, in an effort to be conservative even though Mr. A.J. Hernandez testified he could incorporate LanBox into SkyPostal's existing facility. *Id.*; (Tr. Vol. I at 86.) Finally, Mr. Pollack rounded down the value after the hypothetical lease obligations and determined the value to be

$5,500,000.

Plaintiffs argue that simply taking the unadjusted EBITDA of $912,658 for LanBox, the figure for the trailing twelve months ending April 30, 2007 (Tr. Vol. III at 78) (Pl.'s Tr. Ex. 70 at Schedule 6), and eliminating any adjustments by the experts, and applying an EBITDA multiple of 5, results in a value of $4,563,290 for LanBox at the time of the transaction. (Tr. Closing Argument at 49.) Mr. Calzada agrees with the EBITDA multiple of 5, but disagrees with applying it to an EBITDA of $912,658. (Tr. Vol. IV at 64 [Hector Calzada, Jr. testifying] "You're characterizing LanBox as earning 900,000. LanBox is not earning 900,000. We know the interrelationship with SkyNet. We know that there are transactions that are taking place with SkyNet without any margin changed. When you remove LanBox from SkyNet, that 900,000 misrepresents the profitability of that entity.".) Nevertheless, the Court is persuaded and agrees with Mr. Pollack's report at Schedule 6, which shows an unadjusted EBITDA of over $900,000 for the relevant time period. (Pls.' Tr. Ex. 70 at Schedule 6.)

4.       *Specific Areas where Mr. Pollack was Conservative*

a.       *Line Haul Rates*

Because SkyPostal had significantly lower line haul rates (about 38.93% of LanBox's rate), Mr. Pollack calculated there would be a savings of $424,927 if LanBox were operated under SkyPostal (LanBox Line Haul Rate for the trailing twelve months ending April 30, 2007 ($695,803) minus the reduced line haul rate ($270,876)). (Tr. Vol. II at 116); (Pls.' Tr. Ex. 58 showing LanBox's line haul rate of $2.64 to $3.31 per kilogram) and (Pls.' Tr. Ex. 57 showing SkyPostal's line haul rate of $1.16 per kilogram.) Mr. Pollack made no adjustment for these savings and instead assumed that LanBox would continue to pay the same inflated line haul rates that it was paying to

-10-

SkyNet and other service providers. (Tr. Vol. II at 117); (Pls. Tr. Ex. 70.)  His testimony was that

he ignored these cost savings in an effort to be conservative in his valuation model.  *Id.*

b.     *Overhead*

Mr. Pollack made adjustments for overhead.  For example, Mr. A.J. Hernandez testified that

Plaintiffs would only need to hire 9 additional employees to run PuntoMio at the same capacity as

LanBox in 2007.  (Tr. Vol. I at 92.)  Mr. Pollack assumed 32 additional employees would be needed.

(Tr. Vol. II at 59.)  Mr.  Pollack also was conservative in adding $244,500 in lease expenses even

though, Mr. A.J. Hernandez testified that he could incorporate LanBox into Plaintiffs' existing office

space, saving on rent, utilities and insurance. (Pls.' Tr. Ex. 70 at 11 showing Mr. Pollack subtracted

lease expenses from the valuation in the amount of $244,500); (Tr. Vol. I at 86; Tr. Vol. II at 105

"Q: So in practical terms what kind of cost-savings would occur if LanBox and its operation could

fit in and operate out of the SkyPostal facility? A: [Richard Pollack testifying] Well, you wouldn't

need to pay double rent.  You wouldn't need to pay double utilities.  You wouldn't need to pay

double IT people.  You wouldn't need to pay double computers.  You already have the computers

in place.  You would not need to have two presidents or two directors of marketing.  You already

have those people doing it.".)

c.     *Taxes*

Mr. Pollack was also conservative in that he adjusted the LanBox earnings by including a

provision for income taxes at 38.6%, which is the highest marginal tax rate for a Florida corporation,

which reduces his valuation of LanBox.  At the time of the sale, LanBox did not pay income tax on

its earnings and SkyPostal had net operating losses that it could easily carry forward to offset any

earnings from acquiring LanBox. Mr. Pollack gave no impact to the loss carryforward. (Tr. Vol. II

-11-

at 110.)   Not only did Mr. Pollack not give any impact to the loss carryforward, Mr. Pollack calculated an income tax cost at 38.6% in determining the valuation of the company. (Pls.' Tr. Ex. 70 at 6.)

D.     *Summary of Hector G. Calzada, Jr.'s Testimony*

At trial, the Court did find Mr. Hector G. Calzada, Jr. qualified to testify after Plaintiffs' voir dire of his qualifications. Mr. Calzada is the Director of Deloitte Financial Advisory Services, LLP valuation practice. (Pls.' Tr. Ex. 71 at 39.) Mr. Calzada used a discounted cash flow approach in his valuation analysis to deal with unexpected changes in cash flows.  Mr. Calzada opined that at the time of the sale the investment value of LanBox to Plaintiffs was no more than $1.59 million. (Pls.' Tr. Ex. 71 at 36); (Tr. Vol. IV at 28.)

At the outset of analyzing Mr. Calzada's testimony, the Court notes that throughout Mr. Calzada's report, he relied on synergies that LanBox had as operating as a subsidiary of the LAN companies. (Pls.' Tr. Ex. 71 at 14-17.) Free air travel for LanBox employees, preferred credit card rates, and reduced marketing expenses were some of the highlights that Mr. Calzada relied on to show that had Plaintiffs successfully purchased LanBox, they would have lost out on these benefits and incurred incremental costs.  The problem with relying on this information is that time and again in trial, the evidence showed that the benefits LanBox obtained from operating in the LAN network of companies, was undocumented and not quantifiable.  (Tr. Vol. II at 116-117, 121 [Javier Luck testifying] "Q: You also said to the Judge that there were marketing costs that were not reflected in the books and records of LanBox that would have been a cost-savings that they had while they were with the LAN companies but would not have had if they were sold to another entity, right? A. Right.".) Despite this dearth of evidence, Mr. Calzada does attempt to quantify LanBox's synergies

-12-

with the LAN companies in calculating the EBITDA. (Pls.' Tr. Ex. 71 at 26 showing a loss of cost savings for LanBox if acquired by Plaintiffs.)

1.     *Analysis of Projected Synergies with SkyPostal*

Mr. Calzada extensively analyzed the financial condition of SkyPostal and predicted that it could not survive financially past May 16, 2010. (Pls.' Tr. Ex. 71 at 20-22.) The elimination of SkyPostal would reduce the benefit of the "synergies" the Plaintiffs' are including in their investment value. (Pls.' Tr. Ex. 71 at 27.) Mr. Calzada's opinion is that once SkyPostal ceases to operate, then those synergies are lost and LanBox would have to assume incremental overhead and operating costs that it may have previously shared with SkyPostal. *Id.* at 22, 27.

As proof of SkyPostal's imminent demise, Defendant emphasizes the financial condition of the company since the sale. There are reported net losses of $3.2 million for SkyPostal's first three quarters of 2009. (Pls.' Tr. Ex. 45 at SP 00092.) SkyPostal failed to meet its business plan forecast to reach profitability in 2009. *Id.*

2.     *Discount Rate*

As explained in the summary of Mr. Pollack's testimony, the discount rate incorporates the risk of an investment in the particular business. (Pls.' Tr. Ex. 70 at § 2.2.2; Pls.' Tr. Ex. 71 at §§ 7.1, 7.2, 7.2.1.) Stated another way, the discount rate is the estimated rate of return currently available in the market on alternative investments with comparable risk. (Pls.' Tr. Ex. 70 at § 2.2.2.) Both experts used the buildup method to calculate the discount rate. Under this method, the discount rate is the sum of various components, which are derived from verifiable, empirical data regarding the returns on investments. Both experts agree that LanBox was subject to the risk of doing business in Latin America and the Caribbean, but disagree on the magnitude of the risk.

-13-

Mr. Calzada specifically quantified the risk based on empirical data from the International Cost of Capital (the "ICC") published by Ibottson. (Pls.' Ex. 71 at § 7.2.1.)  The ICC is based on an analysis of empirical data that quantifies the additional risk for equity investments or cash flows in a foreign country.  Mr. Calzada obtained the information for countries in which LanBox operated and then selected the country with the lowest additional risk -- he chose Chile.  LanBox operated in countries with greater risk than Chile.  Mr. Calzada quantified the sovereign risk adjustment at 7%. (Pls. Tr. Ex. 71 at 23.)

### 3.    *The sale to Mr. Gartlan*

Both experts also considered the prior transaction method to valuation.  The comparable transaction approach relies on other market transactions of different businesses.  Mr. Calzada determined that the transaction with Mr. Gartlan was at arm's length, and is therefore, the best indication of the value of LanBox.  (Pls.' Tr. Exh, 70 at 30) (stating the sale to Mr. Gartlan "can provide the best indication of fair market value.".)

In doing so, Mr. Calzada analyzed the sale process that occurred during the six month period preceding the sale of LanBox in May 2007.  He noted that multiple interested parties were involved in the process, including those connected to the industry.  Mr. Javier Luck, LanLogistics, explained that it was known in the industry that LanBox was for sale, and no interested party was prevented from bidding.  Mr. Luck testified that LanLogistics successfully negotiated a substantial increase in the consideration from Mr. Gartlan's offer.  In Mr. Calzada's opinion, the transaction was representative of the fair market value of the businesses. (Pls.' Tr. Ex. 71 at 30-37.)

According to Mr. Calzada, the transaction with Mr. Gartlan showed Mr. Pollack's valuation to be out of line with the market's assessment of the value of LanBox. *Id.*  Because All Carrier was

-14-

a profitable business, it had value and therefore the value of LanBox (in the market's view) was less than the $3.5 million transaction amount. *Id.* Mr. Calzada said the sale of LanBox together with SkyNet included synergies and cost-savings similar to the synergies and cost savings Mr. Pollack assumed. In Mr. Calzada's opinion, this is significant because the market's assessment of value (as reflected in the transaction) included the benefit of synergies, which in his view contradicts Mr. Pollack's opinion. (Pls.' Tr. Ex. 71 at 36.)

E.   *Prior Valuation Report for LanBox from 2004*

In 2004, Paul D. DeStefanis of Advanced Business Valuations prepared a valuation report of LanBox. At that time, LanLogistics was considering purchasing Plaintiffs remaining shares in LanBox. (Tr. Vol. III at 37); (Pls.' Tr. Ex. 2.) Mr. DeStefanis, a Certified Public Accountant, prepared a report using a 4% growth rate (1% higher than both Mr. Pollack and Mr. Calzada), a 2% company specific rate (compared to Mr. Pollack's 3% company specific rate and Mr. Calzada's 7% sovereign risk adjustment), and a 12% capitalization rate (compared to Mr. Pollack's 16.6% rate and Mr. Calzada's rate of close to 24%). Mr. DeStefanis calculated these rates at a time when LanBox was incurring significant losses, as opposed to at the time of the sale, when LanBox had positive earnings. (Pls.' Tr. Ex. 2 at Ex. 1 showing losses and Pls.' Tr. Ex. 70, Schedule 6 showing positive net income for 2005 to Trailing Twelve Months ending 4/30/2007); *see also* ((Tr. Vol. III at 75-76) (testimony of Javier Luck admitting that company "was in bad shape" in 2004).) The 2004 report valuates LanBox at $2.5 million when LanLogistics was buying out Plaintiffs, the minority shareholders. (Pls.' Tr. Ex. 2.)

In cross-examination, Mr. Calzada agreed that Mr. Pollack's capitalization rate and discount rates were more conservative than Mr. DeStefanis's rates. ((Tr. Vol. IV at 66) ([Hector Calzada, Jr.

testifying] "If Mr. Pollack had used a 12-percent cap rate, do you agree that that would have increased the value of LanBox? A. A 12-percent capitalization rate would increase the value of LanBox. . . Q: If Mr. Pollack would have used the same discount rate as Business Valuations -- Advanced Business Valuations, he would have arrived at a higher value for LanBox right? A. The calculation works out that way.").) Mr. Calzada's capitalization rate was double that used by Advanced Business Valuations in 2004, even though LanBox was making money in 2007 and having losses in 2004. (Tr. Vol. IV at 67.) As for the growth rate, Mr. Calzada also agreed that Mr. Pollack's rate was more conservative than that used by Mr. DeStefanis in 2004. ((Tr. Vol. IV at 67) ([Hector Calzada, Jr. testifying] "Q: And had Mr. Pollack used the same growth rate as Advanced Business Valuations he would have arrived at a higher value for LanBox right? A. That is correct.").) Mr. Calzada made the same concession as to Mr. Pollack's selection of a 3% company specific risk rate. ((Tr. Vol. IV at 68) ([Hector Calzada, Jr. testifying] "Q: And had he used a lower company-specific risk premium [like the 2% Mr. DeStefanis used], that again would have resulted in a higher value for LanBox? A. It would have.").) Without a persuasive explanation, Mr. Calzada found the two other valuators incorrectly applied a lower company specific risk premium and found an additional 7% sovereign risk adjustment necessary, which allows him to opine a lower value for LanBox. (Tr. Vol. IV at 74.) Though Mr. Calzada did not do a country-by-country analysis, he agreed LanBox was dealing with a relatively similar group of countries between 2004 and 2007. (Tr. Vol. IV at 73.)

LanLogistics relied on this 2004 report in purchasing Plaintiffs' remaining shares of LanBox. As set forth above, the valuation rates in this 2004 report are more aggressive than Mr. Pollack's and the Court finds them credible as they were generated at a time when Defendant was seeking to cash out Plaintiffs, the minority shareholders in LanBox. ((Tr. Vol. II at 110) ([Richard Pollack testifying]

"Q: To value LanBox. How did the factors they used compare to the factors you used in your valuation? A.: They were actually much more aggressive in their valuation assumptions. They included value for the tax operating loss carryforward [to which Pollack did not give any impact] . . .they actually use a lower rate in discounting the cash flows; and they come up with a value for - - a tax benefit of over a million dollars, and they actually value the market value of the business at $2.5 million.").) Plaintiffs have provided the Court with an analysis showing that applying the 2004 rates would result in a value of $7.45 million for LanBox, which is substantially higher than Mr. Pollack's conclusion. (Pls.' Post-Closing Memorandum at Ex. A.) Overall, the 2004 report valued LanBox at $2.5 million, a figure that is higher than Mr. Calzada's valuation despite LanBox's better finances in 2007.

## II.  Conclusions of Law

A.  *The Measure of Damages*

It is axiomatic that the measure of damages must flow from the breach. *Goldberg v. Paris Hilton Entm't, Inc.*, 2009 WL 2525482, at *3 (S.D. Fla. Aug. 17, 2009).  Under Florida law, there is a bar on speculative or illusory damages. *Swindell v. Crowson*, 712 So. 2d 1162, 1164 (Fla. 2d DCA 1998).  That being said, federal courts have recognized that when calculating damages to a specific plaintiff, strategic value or unique value should be used as the standard of value.  *See Lawton v. Nyman*, 357 F. Supp. 2d 428, 438 (D.R.I. 2005) (explaining the difference between a company's financial value and the much greater strategic value to a particular buyer); *King Fisher Marine Serv., Inc. v. NP Sunbonnet*, 724 F.2d 1181, 1185-87 (5th Cir. 1984) (awarding damages more than seven

times the purchase price of a vessel that was purchased two days before the defendant negligently towed it causing the vessel's total loss because of its unique capabilities).

In *Lawton*, the plaintiffs were shareholders who sold their shares in a closely held family business to the defendants who breached their fiduciary duty by failing to disclose that a strategic buyer was interested in purchasing the family business for a significant premium above fair market value, and above what defendants paid plaintiffs for their shares. *Lawton*, 357 F. Supp. 2d at 431-32. Although the plaintiffs in *Lawton* sold their shares in the company to defendants for $303 per share, the court held that they were entitled to receive damages at a rate of at least $2,385.97 per share. *Id.* at 444-445, Table 1. The *Lawton* Court explained that the difference was attributable to the strategic value, which was far greater than the financial value or the market value. Put another way, damages were based on the strategic value to the buyer, which was significantly higher than the value to a "run of the mill" buyer. *Id.* at 438.

Like the plaintiffs in *Lawton*, Plaintiffs built their case on their unique position in the marketplace, which made LanBox more valuable to them. The Court does not agree with Defendant's assertions that Plaintiffs have failed to meet their burden. The testimony of A.J. Hernandez credibly established the synergies between LanBox and Plaintiffs' existing company SkyPostal. Mr. Hernandez credibly explained how he could incorporate LanBox into his existing office space and how he could overlap employees working at SkyPostal to perform LanBox functions. Not only could Mr. Hernandez have saved on overhead, he also could have used his favorable line haul rates from SkyPostal in operating LanBox. He had tax benefits from the losses carrying forward on SkyPostal, that also made the acquisition of LanBox more valuable to him at the time of the sale. And, Mr. Hernandez testified that having previously run LanBox, he knew the volume and he had the ability to absorb that volume.

-18-

Because this is a logistics business, Mr. Hernandez credibly testified that the higher the volume, the better his rates would be. Handling fees such as the flat fees charged on master airway bills could be spread out over a larger volume, and clearance fees could similarly be spread out over a higher volume, resulting in lower per kilogram expenses and thus a higher yield per kilogram.

Accordingly, the Court does find that Plaintiffs were unique buyers to whom the investment value of LanBox was greater than the sale price to Mr. Gartlan of $450,000. The breach of the right of first refusal did cause Plaintiffs greater damage than to the average run of the mill buyer because of their unique position to acquire LanBox and "run with it." They did not have to acquire space, hire a significant number of employees, or even pay taxes. Furthermore, some of the favorable rates Plaintiffs had already negotiated would only be more favorable with increased volume. The question that the Court must now address is how to value those synergies in determining the overall value to the Plaintiffs.

### B. Expert Reports

Though the Court found both experts to be qualified, the Court found the testimony of Richard Pollack more persuasive. Mr. Calzada did not concede even minor points. For example, when asked whether anyone at Deloitte Financial Services had reviewed his work, Mr. Calzada indicated that Mr. Kevin Moss, from Deloitte and Touche had reviewed it. However, his name did not appear on the report. The Court asked Defendant whether it wanted to present the testimony of Mr. Moss, the alleged "reviewer," in light of the pending *Daubert* motion challenging Mr. Calzada's analysis. Nevertheless, Defendant decided not to present the peer review testimony. (Tr. Vol. IV at 41-50.) Mr. Calzada's credentials were sufficient to allow his testimony before the trier of fact. But his qualifications do not measure up to Mr. Pollack's. Presenting another member of Deloitte's expert business valuation team

-19-

with credentials similar to Mr. Pollack's would have bolstered Mr. Calzada's testimony. If indeed any member of Deloitte's expert business valuation team reviewed and agreed with Mr. Calzada's report that expert's name should have been on the report or the expert should have been called as a witness, in view of the Court's invitation to hear that testimony.

When reviewing the reports, it is plain to see that Mr. Pollack was indeed conservative in his valuation. Even Mr. Calzada admitted the rates Mr. Pollack used were even more conservative than those used in the 2004 Advanced Business Valuations Report, which was issued at a time when LanBox was losing money. *See Prescott Group Small Cap, L.P. v. Coleman Co.*, 2004 WL 2059515, at *32 (Del. Ch. Sept. 8, 1994) (stating the most reliable source of the value of an entity is the value that was determined to acquire the controlling interest and cash out the minority shareholders). Mr. Pollack's rates were derived to value the company at a time of positive earnings. (Pls.' Tr. Ex. 70 at Schedule 6 (showing a positive EBITDA of over $900,000 for the trailing twelve months ending April 30, 2007).) Yet, Mr. Pollack's rates were more conservative (3% growth rate, as opposed to 4%). He added in taxes and lease costs, despite the apparent synergies with SkyPostal.

Separate from the lack of peer review testimony, the Court can identify certain deficiencies in Hector Calzada's testimony and for that reason finds Mr. Pollack's testimony more persuasive. First, Defendants emphasize that Mr. Calzada relied on other bids, as evidence of value. While the Court agrees that generally an open bidding process would be the best evidence of value, the testimony of Javier Luck belies that any such process occurred here. Javier Luck's testimony was that many of the bidders had insider relationships with the LAN companies. Raimundo Martinez was a former president of LanBox. Julio Aninat was a former officer of LanLogistics and Mr. Gartlan was a former officer of LanLogistics' parent company, a current, substantial vendor to various LAN companies and

knows the owner of LAN. Simply stated, the evidence did not show this company was put up for an open bidding process. Given this evidence, the Court cannot agree with Mr. Calzada that in this case the other bids are the best evidence of value.

Moreover, Mr. Calzada emphasized the financial situation of SkyPostal at the time of the sale, arguing that given that situation it was unlikely to stay in business. Its imminent failure as a business would likely mean that it could not sustain its synergies with LanBox. The evidence at trial showed that SkyPostal nearly doubled its revenue between December 31, 2006 and December 31, 2008 from $5.9 million to $9 million. (Pls.' Tr. Ex. 71 at 11) while overall payroll rose by only $19,000 (Pls.' Tr. Ex. 50.) The Court is also persuaded that Mr. Pollack was more familiar with SkyPostal's operations because Mr. Calzada admittedly did not visit SkyPostal's facility and did not recognize synergies between SkyPostal's management team and LanBox. He opined that SkyPostal would incur $390,953 in additional payroll expenses because for some reason it would not be able to use its current management team. (Pls.' Tr. Ex. 71 at 9.)

Another component of Mr. Calzada's testimony the Court found unpersuasive was his adjustments for LanBox's benefits while it was in the LAN family of companies. While the Court does realize that there certainly were benefits, the methodology to quantify these benefits was not verifiable. Mr. Luck testified that the alleged costs were not reflected on LanBox's financial statements. (Tr. Vol. III at 55, 124-127.) Mr. Calzada's testimony was in line with Mr. Luck's. He admitted at trial that these benefits were not on the books and simply derived from information he obtained from Mr. Javier Luck. (Tr. Vol. IV at 102-104.) For example, Mr. Calzada determined that LanBox enjoyed preferential LAN negotiated credit card rates. (Pls.' Tr. Ex. 71 at 16.) To support

this contention, he relied on a 2001 KPMG report, six years before the transaction at issue in this case. Beyond that, he did not compare that rate to SkyPostal's credit card rates. *Id.*

Mr. Calzada also made other adjustments for marketing expenses, that LanBox avoided as a member of the LAN family. Again, these benefits were not recorded and the Court cannot determine the effect of the marketing costs on LanBox's value.

As the Court has emphasized, SkyPostal enjoyed a very favorable line haul rate of $1.16 per kilogram compared to LanBox's line haul rate of $2.64 to $3.31. (Pls.' Tr. Ex. 57 & 58.) Rather than consider this favorable rate, Mr. Calzada added $183,290 in additional expenses he assumes would result from allegedly discontinuing SkyNet's preferential or no margin logistics, freight and domestic delivery cost. (Pls.' Tr. Ex. 71 at 17.) Mr. Calzada did not adequately explain why he failed to consider the actual line haul rates for SkyPostal in determining the value of LanBox. Mr. Calzada likewise did not consider Plaintiffs' actual credit card rates in opining Plaintiffs' credit card rates were higher than Defendant's. He instead relied on six or seven-year old rates.

Likewise, Mr. Calzada's use of a 7% sovereign risk adjustment is not adequately supported. The International Cost of Capital (ICC) is based on an analysis of empirical data that quantifies the additional risk for equity investments or cash flows in a foreign country. Mr. Calzada obtained the information for countries in which LanBox operated and then selected the country with the lowest additional risk -- he chose Chile. LanBox operated in countries with greater risk than Chile. Mr. Calzada quantified the sovereign risk adjustment at 7%. Ibottson states that rates should be based on "the perspective of a U.S. based investor with an equity investment in different markets around the world." (Pls' Tr. Ex. 59.) LanBox is located in the United States, has offices in the United States, primarily receives goods in the United States for distribution in Latin America, and transacts business

in dollars. (Tr. Vol. III at 98.) In short, LanBox is not a company that makes "equity investment[s] in different markets around the world."

The experts disagreed on this company specific risk rate. Again, the Court finds Mr. Pollack's use of the 3% rate more credible than Mr. Calzada's additional 7% sovereign risk premium. "[T]he proponent of a company specific risk premium bears the burden of convincing the Court of the premium's appropriateness." *In re Sunbelt Beverage Corp.*, No. 16089-CC, 2010 WL 26539, at *12 (Del. Ch. Feb. 15, 2010) (quoting *Hintmann v. Fred Weber, Inc.*, 1998 WL 83058, at *5 (Del. Ch. Feb. 17, 1998)). The *In re Sunbelt* court actually rejected the use of a company-specific risk premium altogether. *Id.*, 2010 WL 26539, at *13. In reviewing the evidence relating to the company-specific risk premium, the Court was initially persuaded that there was some risk in doing business in Latin America, but after reviewing the totality of the evidence, the Court now finds that Defendant failed to carry its burden. First, the Ibottson definition does not seem to apply to a company like LanBox. LanBox is not in the business of investing in foreign based companies. ((Tr. Vol. II at 127 ([Richard Pollack testifying] "A. Yes. I think that's an inappropriate guide to use if that guide specifically said it's to be used for U.S. investors that have equity investments overseas, and that's not the case here.").) Second, LanBox is a business that conducts deliveries in a variety of Latin American countries and charges in American dollars. Mr. Pollack's testimony is that this caused a diversification of the risk. Had it been doing business in one country, then that certainly would be grounds for considering a higher risk rate. That is not the case. Mr. Calzada even admitted that by servicing 30+ countries and thousands of customers, the collective effect of any currency risk was spread out. (Tr. Vol. IV. at 192.) Finally, Mr. Pollack's use of a 3% rate is more in line with that used by the disinterested expert in 2004. Indeed, it is more conservative.

For these reasons, the Court is persuaded by Mr. Pollack's expert opinion and adopts his valuation of LanBox in May 16, 2007 as $5,050,000.

### C. *Prejudgment Interest*

Under Florida law, the prevailing party in a breach of contract claim is entitled to prejudgment interest where the verdict fixes damages as of a prior date. *Ins. Co. of N. Am. v. Lexow*, 937 F.2d 569, 571 (11th Cir. 1991). Prejudgment interest on damages stemming from a breach of contract is calculated from the date on which the loss occurred, which in this case is May 16, 2007. *See Gilchrist Timber Co., v. ITT Rayonier, Inc.*, 472 F.3d 1329, 1331 (11th Cir. 2006) (explaining further that awards in tort are generally excluded from an application of prejudgment interest).

Plaintiffs are seeking prejudgment interest from the date of May 16, 2007 through the date of judgment. Plaintiffs ask the Court to use the prejudgment interest rate found in Florida Statute § 55.03. Based on that rate, Plaintiffs are requesting $1,254,504.84 as of the date of the closing argument plus 11% until the time of final judgment.

Defendant opposes an award of prejudgment interest arguing damages are unliquidated and subject to contested expert testimony. *See, e.g., Checkers Drive-In Rests. Inc. v. Tampa Check Mate Food Servs., Inc.*, 805 So. 2d 941, 945 (Fla. 2d DCA 2001) (finding franchisee only entitled to prejudgment interest from date of jury verdict on fraudulent inducement claim). Courts have consistently refused to award prejudgment interest when the damages are speculative, and where lost profits are involved. *See, e.g., Argonaut Ins. Co. v. May Plumbing Co.*, 474 So. 2d 212, 215 (Fla. 1985). This case, however, is not a lost profits case where damages are speculative. The parties do not have to be in agreement as to the value of damages on the date of loss to apply prejudgment interest. *Jablonski v. St. Paul Fire & Marine Ins. Co.*, 645 F. Supp. 2d 1101, 1105-06 (M.D. Fla.

2009) (citing to *Underhill Fancy Veal v. Padot*, 677 So. 2d 1378 (Fla. 1st DCA 1996)).   It is only necessary to show that value was ascertainable at that time. *Id.* Here, damages are ascertained as of May 16, 2007 and are calculated as the difference between the purchase price and the investment value of LanBox to the Plaintiffs at the time of the transaction.

In right of first refusal cases, courts have found that prejudgment interest applies even where certain values were contested and dependent on expert testimony. *Unlimited Equip. Lines v. Graphic Arts Centre, Inc.*, 889 S.W.2d 926, 942-43 (Mo. Ct. App. 1994).   Moreover, a right of first refusal is a vested and valuable property right. *Boyd & Mahoney v. Chevron*, 614 A.2d 1191, 1194-96 (Pa. Sup. Ct. 1992).   An award of prejudgment interest is appropriate where there is a loss of a vested property right. *Bosem v. MUSA Holdings*, 8 So. 3d 1185 (Fla. 4th DCA 2009) (stating prejudgment interest award is appropriate where there is a loss of a vested property right).   Accordingly, the Court finds an award of prejudgment interest appropriate.

The amount of prejudgment interest due Plaintiffs is $1,254,504.84, which is calculated using the statutory rate of interest found in section 55.03 of the Florida Statutes.   This amount is calculated as of the date of closing argument.   Plaintiffs are entitled to additional prejudgment interest until the date of judgment.

*D. Postjudgment Interest*

Post-judgment interest applies to all compensatory damages, including prejudgment interest. 28 U.S.C. § 1961(a).   ("Interest shall be allowed on any money judgment in a civil case recovered in a district court . . . .").   Accordingly, the Court also awards Plaintiffs postjudgment interest.

### III. Conclusion

For the reasons stated in this Order, the Court finds Plaintiffs have met their burden and awards them $5,050,000 in damages, plus prejudgment and postjudgment interest.

DONE AND ORDERED in Chambers at Miami, Florida, this ___ day of June, 2010.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:

Counsel of Record

-26-